M. J. Derden v. The State.

No. 4042. Decided June 2, 1909.

1.—Murder—Verdict—Absence of Defendant—Statutes Construed.

Articles 633, 748 and 749, Code Criminal Procedure, were not so modified by the Act of the Thirtieth Legislature, p. 31, as not to require defendant's presence when the verdict was read, unless such absence was willful or voluntary.

2.—Same—Voluntary Absence of Defendant.

Under any possible definition of the word voluntary, it is implied of necessity that the absence of defendant during trial must have resulted from choice or exercise of the will. Neither unavoidable nor unintentional absence would be voluntary; even an absence occasioned by negligence, which was neither purposeful, deliberate nor under circumstances from which such an intention could be presumed, would be voluntary.

**3.—Same—Case Stated.**

Where upon trial for murder the verdict was received in the absence of the defendant, which was neither willful nor voluntary, the same was reversible error, although his counsel was present and made no objections to the action of the court, but neither consented thereto nor waived his client's presence; defendant being on bail.

**4.—Same—Evidence—Res Gestae—Charge of Court.**

Upon trial for murder there was no error in admitting in evidence a second altercation between defendant and deceased, shortly after the first difficulty in which deceased had been fatally wounded by the defendant, and after the parties had separated for some time, such evidence having been properly submitted under a requested charge by the defendant. Ramsey, judge, dissenting.

**5.—Same—Charge of Court—Abandonment of Difficulty—Words and Phrases.**

Where upon trial for murder the court charged the jury that where a party is assaulted and his adversary apparently abandons the difficulty, etc., and it was evident that the court used the word "apparently" in the same sense ·of evidently, obviously or clearly, when considering the charge of the court as a whole, there was no error.

Appeal from the District Court of Smith. Tried below before the Hon. R. W. Simpson.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

The requested charge by the defendant on the subject of the second difficulty was as follows: "You are instructed that testimony of the trouble that occurred in the drugstore after the shooting was only permitted for the purpose of showing the minds of the parties at the time of the original difficulty; if you believe from the testimony that the defendant believed that the deceased, Mitcham, when he entered the building and caught hold of a chair intended to renew the difficulty, and that defendant caught hold of another chair intending to defend himself, then you should not consider this testimony for any purpose."

The opinion states the case.

*Richardson & Watkins, Faulk & Faulk* and *Johnson & Edwards,* for appellant.—On question of receiving verdict in defendant's absence: Lewis v. United States, 146 U. S., 370; Sherrod v. State, 47 So. Rep., 554; Hill v. State, 54 Texas Crim. Rep., 646, 114 S. W. Rep., 117; Choice v. State, 52 Texas Crim. Rep., 285, 106 S. W. Rep., 387. On question of admitting evidence as to second altercation: 3 Rice on Ev., p. 126. On question of abandonment of difficulty: Burrage v. State, 44 S. W. Rep., 169; Burris v. State, ·34 Texas Crim. Rep., 387, 30 S. W. Rep., 786.

*F. J. McCord,* Assistant Attorney-General, and *John S. Prince,* for the State.—On question of receiving verdict: Hill v. State, 54 Texas Crim. Rep., 646, 114 S. W. Rep., 117; Wyatt v. State, 49 Texas Crim. Rep., 193, 94 S. W. Rep., 219.

RAMSEY, JUDGE.—Appellant was indicted on the 7th day of September, 1907, in the District Court of Henderson County charged with the murder of one John R. Mitcham. The case was thereafter transferred on a change of venue to Smith County. A trial had in said court on October 11, 1908, resulted in a conviction of the offense of manslaughter, with the punishment assessed at four years confinement in the penitentiary.

Appellant and deceased had been partners for about a year before the homicide, and their relations up to a short time before the killing had been friendly. The deceased made a dying statement, which was admitted in evidence, and according to his version of the matter the appellant was the aggressor and brought about the difficulty—called him a liar, and pulled his pistol on him out of his inside pocket, seeing which he reached on his desk and hit appellant over the head with a notary seal, when appellant jerked loose from him and told him he was going to kill him right there, and he ran, and appellant shot at him several times, hitting him the third shot, which took effect in his back, and from which he shortly thereafter died. Appellant gave a wholly different version of the matter, and states that he had gone to deceased's office to secure a settlement, and that deceased was the first to get mad, and that, seeing his growing anger, he looked off to keep from getting mad himself, and as he looked back he saw the seal in the hands of deceased descending, and that deceased was at the time in the act of striking, accompanied with the statement, "I will kill you;" that deceased inflicted a severe blow upon him, from which he staggered against the door, and that during the encounter deceased hit him several times, which stunned or dazed him; that about the time of the infliction of the last blow he had somewhat recovered; that up to this time he had not drawn a pistol; that he was a right-handed man, but drew his pistol with his left hand, and that it went off while he was in the act of getting it out; that about the time the second shot was fired he was going through the door, and deceased went out on the gallery. From this time on he gives a somewhat confused account of the shooting, claiming not to remember, or know very well, the details. He makes by his testimony a case of self-defense, whereas the State's testimony, if believed, would tend strongly to show, in the first place, that appellant provoked the difficulty, was the aggressor, and was not acting in self-defense, and that in any event, at the time of the fatal wound, deceased had abandoned the difficulty, and appellant was in no danger from him. We have not sought to more than state the relative contentions of the respective parties, so that the opinion may be readily understood.

1. The first question presented was almost the last to arise on the trial, and relates to the action of the court in receiving the verdict of the jury in the absence of appellant. We think the action of the court in this respect was erroneous, and without reference to the other questions presented must result in a reversal of the judgment. The

matter is very fully stated in the bill of exceptions, which is not modified in any respect by any statement or explanation of the court. As the question is somewhat new, under our present statute, we set out the facts as preserved in the bill in their entirety. They are as follows: "This cause was submitted to the jury on Saturday night, October 10, 1908; when the cause was submitted to the jury the court suggested to them that they do not consider the case or attempt to arrive at a verdict that night, but that he would not return to his home in Gilmer, but would remain in Tyler over Sunday for the purpose of receiving the verdict in the event the jury should come to an agreement during Sunday. And that they would be permitted to return a verdict on Sunday if they came to a verdict. The court was not opened on Sunday, nor did the court convene or assemble in session on Sunday, until the jury were ready to return their verdict, which was done Sunday afternoon, October 11th, about four o'clock. The defendant was on bond at the time of his trial; and when the court adjourned Saturday night defendant went to his boarding-house in Tyler, where he was stopping, about two blocks from the courthouse, and there spent the night. On Sunday forenoon the defendant came to the courthouse, and remained at and about the courthouse and courthouse yard until about 11 o'clock in the forenoon. The court was not in session at that time, nor was the judge present at the courthouse at that time, and defendant returned to his boarding-house and there remained, and was at his boarding-house when the jury sent word to the judge that they were ready to report. When the jury arrived at a verdict they had the sheriff to notify the judge, the judge at that time being in his sleeping room in the third story of the courthouse, and at this time the defendant had no knowledge, nor had he been informed, that the jury had reached a verdict or desired to report. When informed that the jury desired to report, the judge came into the courtroom, and defendant's counsel, being in the courthouse yard at that time, was notified that the jury were ready to report, and came into the courtroom just as the jury filed in, and thereupon defendant's counsel notified the court that defendant was at his boarding-house, and that he would notify him at once, and have him to come to court. Defendant's counsel left the courthouse for that purpose, and was informed by the sheriff that he had telephoned to defendant that the jury was ready to report, and defendant's counsel returned immediately into the courtroom and notified the court that the defendant had been notified, and would be in court presently. The defendant was at his boarding-house when telephoned to by the sheriff, and started immediately to the courthouse. Upon being informed by defendant's counsel that defendant had been notified, and was on his way to court, the court said that the presence of the defendant was not necessary or required, and that the verdict could be received in defendant's absence, and had the jury to hand their verdict to the clerk, and the same was received and read before the defendant reached the courthouse, and

while he was on his way from his boarding-house to court, and in his absence, and thereupon the jury were discharged and dispersed. Defendant reached the courthouse yard as the jury were dispersing, and was then informed for the first time of the verdict and action of the jury, and he continued directly to the courthouse, and delivered himself to the sheriff, at which time the jury were dispersing. The verdict was read and received in the defendant's absence, and while he was making his way from his boarding-house to court. One of his counsel was present at the time the verdict was received, and did not consent to the verdict being received or read in the absence of defendant, nor did he waive his presence, nor did he at that time make any objection to the action of the court, the facts with reference to the action of defendant's counsel being as above stated.

"In his motion for new trial, filed herein on October 12, 1908, the action of the court in receiving said verdict and having the same read in his absence was set up as a ground for new trial, and in arrest of judgment, as will fully appear from said motion now on file in this case, and upon the hearing of said motion for new trial and in arrest of judgment the defendant introduced evidence in support thereof, which evidence was to the effect as above stated, and which evidence is directed to be included in the statement of facts in this case, and when so included may be considered as part of this bill of exception." The articles of our Code of Criminal Procedure relating in any way to this matter are (until lately modified) articles 633, 748 and 749. They are as follows: Article 633: "In all prosecutions for felonies, the defendant must be personally present on the trial, and he must likewise be present in all cases of indictment or information for misdemeanors where the punishment or any part thereof is imprisonment in jail." Article 748: "It is the right, either of the State or of the defendant, to have the jury polled, which is done by calling separately the name of each juror, and asking him if it is his verdict. If all, when asked, answer in the affirmative, the verdict shall be entered upon the minutes; but if any juror answer in the negative, the jury shall retire again to consider of their verdict." Article 749: "In cases of felony the defendant must be present when the verdict is read, unless he escape after the commencement of the trial of the cause; but in cases of misdemeanor it may be received and read in his absence." From the earliest days these statutes have been required to be followed with great strictness. It has been held that it is an improper practice to take any step, or have any proceeding in the case, however trivial, formal or unimportant it may appear to be, when the defendant is not present; and it is material error, and will render the proceeding absolutely void, where such proceeding is had during the trial of the case in the absence of the defendant. Mapes v. State, 13 Texas Crim. App., 85; Rudder v. State, 29 Texas Crim. App., 262; Madison v. State, 17 Texas Crim. App., 479, and Conn v. State, 11 Texas Crim. App., 390. It is said it is not sufficient that the defendant should be within the

walls of the courthouse, but he should be present where the trial is conducted, that he may see and be seen, hear and be heard, under such regulations as the law has established. Brown v. State, 38 Texas, 482. It is said further, that he has a right to be present when his motion for new trial is being heard and determined, and that, on appeal, if the record affirmatively shows that his motion for new trial was heard in his absence, and that he subsequently objected thereto in the court below, the conviction shall be set aside and the cause remanded for a new trial. Gibson v. State, 3 Texas Crim. App., 437; Gonzales v. State, 38 Texas Crim. Rep., 62. It has been uniformly held that the defendant ·must be present in a felony case when the verdict is received. Beaumont v. State, 1 Texas Crim. App., 533; Summers v. State, 5 Texas Crim. App., 365; Richardson v. State, 7 Texas Crim. App., 486; Huffman v. State, 28 Texas Crim. App., 174; Mapes v. State, 13 Texas Crim. App., 85. In the last named case, speaking for the court, Judge White says: "We deduce from these decisions that it is an im- · proper practice to take any step, or have any proceeding, however trivial, formal or unimportant it may appear to be, when the defendant is not present, and that it is material error, which will render the proceeding absolutely void, where such proceeding is had during the trial of the case in the absence of the defendant." That this was the law before the passage of the Act of the Thirtieth Legislature does not admit of dispute. That Act, page 31 of the laws of the Thirtieth Legislature, provides as follows: "In all prosecutions for felonies, the defendant must be personally present at the trial, and he must likewise be present in all cases of indictment for misdemeanors where the punishment, or any part thereof, is imprisonment in jail; provided, that in all cases the verdict of the jury shall be received by the court and entered upon the records thereof in the absence of the defendant, when such absence on his part is wilful, or voluntary, and when so received it shall have the same force and effect as if received and entered in the presence of such defendant." This statute, insofar as it relates to the presence of a defendant during the trial, was considered by this court in the case of Hill v. State, 54 Texas Crim. Rep., 646; 114 S. W. Rep., 117, where we said: "This being a felony case, it devolves upon the State to confront the defendant with the testimony during the progress of the trial. This can not be done if the defendant is not personally present. Furthermore, the statute explicitly says the defendant must be personally present, and, waiving any constitutional question, the action of the court is in the face of the statute." In that case counsel undertook to waive the presence of the defendant, with the assurance that no advantage would be taken of it, and the action of the court there related to the matter of reproducing the testimony of certain witnesses, which the record shows was a literal reproduction of the testimony theretofore given by them. So it is obvious the Act of the Thirtieth Legislature must be construed with reference to the law

aforetime, and in the light of the uniform holding of this court, and should not be extended beyond the plain import of the statute. It is contended that, by no fair rule, can it be said in this case that the appellant was wilfully or voluntarily absent. It is apparent, too, that the action of the trial court was not placed on the ground that his absence was either wilful or voluntary, but the verdict seems to have been received in the belief that his presence under the statute was not required, and that it was unimportant how such absence was occasioned. The record shows, as stated, that when the court adjourned on Saturday it did not adjourn to any stated time or hour; that court was not assembled or convened during Sunday; that appellant spent a large part of that day in attendance at and about the courtroom; that his boarding-place was only two blocks away. He could not, in the nature of things, know when the jury were likely to agree on a verdict. It seems, however, that he was reached by telephone immediately after the jury sent word that they were ready to report, and evinced his desire and intention of being present by immediately starting to the courthouse. The bill further shows that the judge knew he was on his way to the courthouse, and would arrive almost immediately, and that he did arrive immediately after the jury were dispersed. If the court had adjourned for any stated time, or had been in session, there might be some reason to hold that he should attend all the ordinary sittings of the court, and hold himself in readiness at any time to hear the judgment of the twelve. But the record shows that the judge himself was not in the courtroom, and had not appeared in the courtroom during the day. It would be a harsh construction to say that the appellant should be more diligent in his attendance upon the court than the judge presiding. Under the uniform holding of this court we are not permitted to inquire as to how far appellant was injured by being deprived of the right to be present. It is sufficient to say that he had a right to be present, and that he must be present, when the verdict was received, unless his absence is voluntary or wilful. The statute gives the accused the right to witness the proceedings, to hear the verdict, to poll the jury, and he has as well the right to inspect such verdict and make any legal objection to it. If we should undertake to sustain the proceedings of the court below on the proposition that no harm was done, and that appellant's counsel were able to represent and do all for him that he could himself do, if present, this would be equally available in every case, and would have the effect to absolutely nullify the statute. That appellant was wilfully absent is not seriously contended; that he was voluntarily absent we can not get our consent to hold. We do not believe he was voluntarily absent, whether we accept the ordinary meaning of the word or its legal signification. "Voluntary" is thus defined by Mr. Webster: "1. Proceeding from the will; produced in or by an act of choice. 2. Unconstrained by the interference of another; unimpelled by the influence of another; not prompted or persuaded by another; done of his or its own accord; spontaneous;

acting of one's self or itself; free. 3. Done by design or intention; intentional; purposed; intended; not accidental; as, if a man kills another by lopping a tree, it is not *voluntary* manslaughter. 4. Of or pertaining to the will; subject to, or regulated by, the will; as, the *voluntary* motions of an animal, such as the movements of the leg or arm (in distinction from *involuntary* motions, such as the movements of the heart); the *voluntary* muscle fibres, which are the agents in voluntary motion." In 29 American and English Encyclopedia of Law, p. 1072, "voluntary" is thus defined: "A voluntary act proceeds from one's own free will; done by choice, or of one's own accord; unconstrained by external interference, force or influence; not prompted or suggested by another. Voluntary means, by the free exercise of the will; done by design, purposely." This definition just quoted is taken almost literally from the decision of Judge Hurt in the case of Thompson v. State, 24 Texas Crim. App., 383, where, in discussing manslaughter, Judge Hurt adopts a portion of the definition of Mr. Webster, in this language: "Webster defines the word voluntary thus: 'Done by design, or intention; purposed; intended; as, if a man kill another by lopping a tree, it is not voluntary manslaughter.'" Under any possible definition of the word it is implied of necessity that the absence must have resulted from choice or exercise of the will. An unavoidable absence would not be voluntary; an unintentional absence, where, under the circumstances, his presence could not be reasonably required, would not be voluntary. Even an absence, though in somewhat serious negligence, which was neither purposeful, deliberate, or under circumstances from which such an intention could be presumed, would not be voluntary. So that, under any view of the case, as we believe, the absence of appellant in this case was not a voluntary absence. It is not such absence as would have justified the court in receiving the verdict of the jury, and, while the result may seem to be based upon slight substantial ground, it is a provision of law, and it does not lie within our province to deny to a citizen of this State a right which in express terms the law gives him. To do so would be the grossest usurpation.

2. Another very difficult question arose in this way. After the fatal encounter, deceased and appellant met in a drug-store, where an effort was made on the part of appellant to assault deceased. This matter is also well stated in the bill, and with a view of insuring accuracy we copy practically the entire bill. It is as follows: "The evidence in the case showed that after deceased was shot he went into the store of C. A. Riddlesperger, about ninety feet from the scene of the shooting; that he remained in this store for a short time, and then went into a drug-store near by; that the defendant, when the shooting was over, turned and went down the walk, or galleries of the stores, and then turned north and went into the store of Thompson Brothers, where he remained for one or two minutes, and then was carried, or led by Mr. Thompson, into the drug-store; that defendant reached the drug-store

before the deceased came in, and was in the drug-store waiting to have his wounds dressed, and for the arrival of a doctor, who had been telephoned for; that while he was in the drug-store thus waiting the deceased came in, as above stated; that the defendant at that time had several wounds on his head, which had been made by the seal in the hands of deceased, and that he was bleeding from these wounds.

"The State offered to prove by C. A. Riddlesperger and Roy Weir, witnesses for the State, that when the deceased came in the drug-store he came on down into the store, and to a point near where defendant was; that he walked up to a chair some eight or ten feet from the defendant, and stopped, and placed his hands upon the back of the chair, as if to lean or rest his weight upon it; that thereupon the defendant took hold of another chair, and started to raise the same as if to use it on deceased, and that he called deceased a damned son-of-a-bitch, and says, 'I will kill you;' that some one took hold of defendant and made him put down the chair, and that defendant then walked around the table and started to pick up another chair, and some one took hold of defendant and made him put it down; that when the defendant took hold of the chair and cursed the deceased, and said he would kill him, the deceased said to the defendant, 'I did not come in here for any trouble; I am looking for a doctor.'

"To all of which testimony thus offered by the State the defendant objected, upon the grounds that same was irrelevant and immaterial; that at the time the same occurred the original difficulty had wholly ceased, and the parties had separated, and that said evidence had no relation to the original difficulty, and shed no light upon the same, and did not tend to show who was the aggressor in said difficulty, nor the mind or motive with which defendant fired the fatal shot, and that said testimony was prejudicial to the defendant and his case. Which objections were by the court overruled, and said testimony admitted, and said witnesses were permitted to testify to the facts as above stated." Under their assignment questioning the correctness of the court in admitting this testimony, the appellant submits this proposition: "Where the difficulty had ended, subsequent acts or conduct on the part of the accused toward his antagonist is not admissible either as *res gestae* nor as the declaration of the accused, unless the same are related to or explains the conduct of the party at the time of the difficulty. To constitute a part of the same transaction, though occurring shortly afterwards, the subsequent conduct must distinctly and palpably proceed from the same motive as the main transaction. Nearness in time is immaterial, the test being in the subsequent conduct explanatory of the issue being investigated." The writer is inclined to think this proposition is correct for these reasons: Mr. Rice, in his valuable work on evidence, quotes approvingly a statement by Chief Justice Beasley, of New Jersey, to the effect "that there are few problems involved in the law of evidence more unsolved than what things are to be embraced in those occurrences that are designated in the law as the *res gestae.*"

"I can readily find," he says, "judicial rulings by force of which this testimony would be excluded; but I can as readily find other rulings of equal weight that would sanction its admission. This result has grown out of the difficulty of applying, with anything like precision, general rules to a class of cases of infinite variety. In the well-considered case of Lund v. Tyngsborough, 9 Cush., 36, it is said: 'The *res gestae* are different in different cases, and it is, perhaps, not possible to frame any definition which would embrace all the various cases which may arise in practice. It is for the judicial mind to determine upon such principles and tests as are established by the law of evidence what facts and circumstances in particular cases come within the import of the terms. In some instances the test indicated will be found in the rule that such declarations are admissible, because they are so connected with an act, itself admissible as part of the *res gestae,* as to have become incorporated with it. The declaration and the act must make up one transaction. The theory justifying this course is that, when such declarations are thus coupled with a probable act, they receive confirmation from it; but if they stand alone, without such support, they depend altogether for their credence on the veracity of the utterer, and, thus conditioned, they are pure hearsay, and inadmissible.' " Alluding to the rule that excludes hearsay, Mr. Starkie, 1 Stark. Ev., p. 65, says: "The principle does not extend to the exclusion of any of what may be termed real or natural facts and circumstances in any way connected with the transaction, and from which any inference as to the truth of the disputed fact can reasonably be made. Hunter v. State, 40 N. J. L., 495." See 3 Rice on Evidence, p. 128. On a full discussion of the whole matter, Mr. Rice finally says: "The rule is, as we have seen, that the whole transaction may be given in evidence. But it is impossible to deduce, from the authorities, an available rule as to what shall be deemed of the transaction and what shall not. The subsidiary act need not transpire at the same instant with the main one, or always even on the same day; and in reason, as well as in accordance with the current of the authorities, the time which divides the two is not the controlling consideration, though it may be taken into the account. Is it presumable that, distinctly and palpably, it influenced, or was influenced, by the main act, or produced from the same motive? If so, it is admissible, otherwise not. Such is the doctrine in reason; and it is submitted the current of authority is, at least, not adverse. Bishop Crim. Proc., sec. 1085." Now let us apply this doctrine to the facts here. Under the proof above admitted, at the time of the transaction above referred to, the death wound had been inflicted; appellant was guilty then or not guilty at all. Of course, every fact and circumstance antecedent to this transaction which would pertinently throw light on the issue was admissible. Certainly, as well, every subsequent act and declaration of the appellant which would pertinently disclose his motive, intent, attitude, malice, or other state of mind illustrative of the question at issue, would be admissible. But

do these facts so admitted come within this rule? The evidence showed the difficulty was over, the parties separated, going in different directions; that appellant had gone to the store of one Thompson for assistance, and had surrendered his weapon; that they met in the drug-store by accident. There is some question as to whether, at that time, appellant knew that Mitcham was wounded. He testifies that he did not know this fact. There is some testimony indicating that he did. It is undoubtedly true that he did not know, and could not, in the nature of things, have known how seriously he was wounded. One of the witnesses, Thompson, testified that he thought that Mitcham was intending to use the chair to assault appellant when he took hold of it. Now, was there anything in this testimony explanatory of any part of the difficulty in which Mitcham was shot? What was it that appellant said or did that related to this difficulty? What was said or done that could throw any light on the shooting, or which would indicate who was the aggressor, how it arose, or who was to blame? It is obvious that, in view of the desperately wounded condition of the deceased, that the admission of this testimony was calculated to arouse the prejudice and inflame the passions of the jury. The testimony showed he was badly hurt, was looking for a doctor, had stated before he reached the drug-store that he was going to die, and the anger and rage of appellant, and his effort to do him violence, were calculated seriously to prejudice appellant. Now, Mr. Rice says the rule is, "is it presumable that, distinctly and palpably, it influenced or was influenced by the main act, or proceeded from the same motive?" Is it not clear that, from the demonstration of the deceased, the acts and declarations of the defendant, in view of deceased's seriously wounded condition, were just as consistent with his innocence as with his guilt, and they are as naturally attributable to a feeling of outrage on his part from a serious, and, as he claimed, unjust attack on him by Mitcham, as to any other motive; and where, as in this case, he neither did anything or said anything which could in any just or proper sense be said to have any proper relation to what had occurred in the first difficulty, as explanatory of its origin, or as indicative of who was the aggressor, or who was to blame, but was rather the expression of his then state of mind attributable to the fact that he had been assaulted by deceased, and received serious and dangerous wounds. The majority hold, however, that the evidence was admissible, and that, in connection with the special charge given at request of counsel for appellant, there was no error committed in respect to this matter.

3. Complaint is made of the following portion of the court's charge: "Where a party is assaulted, and his adversary apparently abandons the difficulty, he has no right to pursue or fire upon him, unless it is necessary to do so in order to protect himself from a renewal of the unlawful attack. In such a case he may lawfully pursue, and his right to pursue continued as long as the necessity continues, and ceases when the necessity ceases. In other words, if it is necessary for the assailed

to pursue and shoot in order to protect himself from a renewal of the unlawful attack, he may lawfully pursue and shoot, and his right to do so continues as long as this necessity continues, and ceases when the necessity ceases, and the test of the necessity is the reasonable belief of the person assailed." This charge is complained of, and it is urged that the use of the word "apparently" was calculated to lead the jury to believe that a mere retreat on the part of deceased, apparently abandoning the difficulty, would cut off appellant's right to continue to shoot; and it is subject to the further objection that the retreat must be for the purpose of procuring another weapon with which to return to the difficulty, before such retreat will constitute an abandonment. Considering the charge here criticised in connection with the whole charge, it is evident that the court used the word "apparently" in the same sense of "evidently," "obviously" or "clearly." In a latter paragraph the court thus instructed the jury, in connection with this same matter: "If you find from the evidence that John R. Mitcham made an unlawful assault upon the defendant with a notary seal, and that said Mitcham in good faith abandoned the difficulty, and retreated in good faith, and defendant so understood it, and followed, and shot and killed said Mitcham, he, the defendant, would not be guilty of any higher offense than manslaughter. On the other hand, if it reasonably appeared to defendant, as viewed from his standpoint at the time, that said Mitcham was not retreating in good faith, but that by retreating he was seeking a vantage ground or a weapon to renew the attack, then defendant would have the right to pursue and to shoot deceased as long as it reasonably appeared to defendant to be necessary for his own self-defense, and if, under such circumstances, defendant shot and killed deceased, you should return a verdict of not guilty." Here in express terms the jury are required to find that Mitcham in good faith abandoned the difficulty, and retreated in good faith, and defendant so understood it. The charge was probably so framed as not to have been right readily understood by the jury, and we suggest on another trial that it be so phrased as not to be open to criticism or objection.

4. There are a great many other questions arising in the case which seem to have been contested with great vigor and zeal on both sides, and which we have carefully considered, and it is our judgment that, except in the respects above noted, appellant has received a fair and impartial trial, and that there was no error in the ruling of the court in respect to any of the other matters called to our attention.

For the error pointed out the judgment is reversed and the cause is remanded.

*Reversed and remanded.*